## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division



**CHESAPEAKE BANK**
97 North Main Street,
 Kilmarnock, Virginia 22482

   Plaintiff,

   v.

**JOSEPH GERRY CULLEN**
1120 N. Bancroft Parkway
Wilmington, Delaware 19805,

**THOMAS HALEY**
41 Millstream Road
Pine Hill, New Jersey 08021,

**BERNARD STROMBERG**
12 Greenview Lane
Haverton, Pennsylvania 19083,

**MICHAEL JUD**
203 Crabapple Road
Manhasset, New York 11030

**DAVID DIVAN**
301 Cathedral Parkway
New York, New York 10027

**JASON D. BLEMINGS**
6725 Montgomery Ave.
Upper Darby, Pennsylvania 19082

**LOGISTICS ASSOCIATES OF
WILMINGTON, LLC.**
Registered Agent:
Joseph G. Cullen
1120 N. Bancroft Parkway
Wilmington, Delaware 19805

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO. 3:10CV247

**JURY TRIAL DEMANDED**

FILED

APR 16 2010

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

**SO REAL BRANDS, LLC**       :
913 North Market Street       :
Suite 1100       :
Wilmington, Delaware 19801,    :
       :
and       :
       :
**CHANCE PRODUCTIONS, INC.**    :
203 Crabapple Road       :
Manhasset, New York 11030    :
       :
      Defendants.    :

## COMPLAINT

Plaintiff, Chesapeake Bank  ("Chesapeake Bank" or "Plaintiff"), by counsel, states as

follows for its Complaint against the defendants Joseph Gerry Cullen ("Cullen"), Thomas Haley

("Haley"), Bernard Stromberg ("Stromberg"), Michael Jud ("Jud"), David Divan ("Divan"),

Jason D. Blemings ("Blemings"), Logistics Associates of Wilmington, LLC ("Logistics"), So

Real Brands, LLC ("So Real Brands"), and Chance Productions, Inc. ("Chance Productions")

(Cullen, Haley, Stromberg, Jud, Divan, Blemings, Logistics, So Real Brands and Chance

Productions, collectively "Defendants"):

## THE PARTIES

1.      Chesapeake Bank is a FDIC insured banking corporation organized pursuant to

the laws of Virginia and having its principal place of business at 97 North Main Street,

Kilmarnock, Virginia 22482.

2.      Upon information and belief, Cullen is a citizen and resident of Delaware,

residing at 1120 N. Bancroft Parkway, Wilmington, Delaware.

3.      Upon information and belief, Haley is a citizen and resident of New Jersey,

2

residing at 41 Millstream Road, Pine Hill, New Jersey.

4.         Upon information and belief, Stromberg is a citizen and resident of Pennsylvania, residing at 12 Greenview Lane, Haverton, Pennsylvania.

5.         Upon information and belief, Jud is a citizen and resident of New York, residing at 203 Crabapple Road, Manhasset, New York.

6.         Upon information and belief, Divan is a citizen and resident of New York, residing at 301 Cathedral Parkway, New York, New York.

7.         Upon information and belief, Blemings is a citizen and resident of Pennsylvania, residing at 6725 Montgomery Avenue, Upper Darby, Pennsylvania.

8.         Upon information and belief, Logistics is a Delaware limited liability company with its principal place of business at 1120 N. Bancroft Parkway, Wilmington, Delaware 19805. Cullen is the registered agent for Logistics.

9.         Upon information and belief, So Real Brands is a Delaware limited liability company with its principal place of business at 913 North Market Street, Suite 1100, Wilmington, Delaware.

10.         Upon information and belief, Chance Productions is a New York corporation having its principal place of business at 203 Crabapple Road, Manhasset, New York.

## JURISDICTION AND VENUE

11.         Plaintiff's claims for relief allege violations of 18 U.S.C. § 1961, *et seq.* Moreover, this civil action is between citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Therefore, this Court has subject matter jurisdiction based on 28 U.S.C. § 1331, as well as 28 U.S.C. § 1332.

3

12.     Venue is proper in this District and Division pursuant to 18 U.S.C. § 1965(a), 28

U.S.C. § 1391 and Local Rule 3 because Defendants transacted business affairs in this

District and substantial part of the events or omissions giving rise to the claims occurred

in this District.

13.     This court has personal jurisdiction over Defendants because Defendants are

subject to the jurisdiction of the state courts of Virginia pursuant to Va. Code § 8.01-

328.1(A)(1) and (A)(3), or in the alternative (A)(4).

## RELEVANT TIME PERIOD

14.     Defendants' scheme to fraudulently obtain money from and inflict damage upon

Chesapeake Bank began in or about April 2009 and continues to date.

## STATEMENT OF FACTS

**I.      The Cash Flow Agreement**

15.     At all times pertinent hereto, a Cash Flow Agreement, dated July 27, 2007,

existed between Chesapeake Bank and Atomica Design, Inc. ("Atomica"), whereupon

Atomica agreed to sell certain of its accounts receivable to Chesapeake Bank subject to

the approval of Chesapeake Bank (the "Cash Flow Agreement"). Exhibit 1 hereto is a

true and correct copy of the Cash Flow Agreement as modified, which is incorporated by

reference herein.

16.     Atomica is a Pennsylvania corporation having its principal place of business at 60

East Bridge Street, Morrisville, Pennsylvania 19067. At all times material hereto,

Atomica was a boutique brand package design firm specializing in consumer products,

and designing for leading companies in the food, beverage, candy, publishing and toy

4

industries.

17.        In accordance with the Cash Flow Agreement, Atomica would electronically forward accounts receivable information to Chesapeake Bank. Such information would include, along with other identifying information, account name, invoice number and amount owed to Atomica by its customers. For those receivables over $10,000.00, Atomica would forward a copy of an invoice representing the amount of the receivable.

18.        Chesapeake Bank would then purchase those receivables it accepted from Atomica. Chesapeake Bank would place a portion of the proceeds of the sale of each receivable in Atomica's account at Chesapeake Bank for Atomica to draw upon for its business purposes. Atomica's customers subsequently would make payments to Chesapeake Bank.

19.        Under the Cash Flow Agreement, Atomica represented, warranted, covenanted and agreed, with respect to each invoice, that: (a) Atomica was the absolute and legal owner of each invoice; (b) all information set forth in the invoice was true, correct and complete; (c) all requirements for payment of each invoice had been fulfilled and was not contingent upon any future act; (d) each invoice was based upon actual sale and delivery of goods and/or services rendered by Atomica, presently due, and not previously sold, assigned, transferred or subject to any security interests; (e) there were no defenses, counterclaims or offsets against any invoice; (f) payment would be made directly to Chesapeake and if made to Atomica in error that Atomica would hold such payment in trust for Chesapeake Bank; (g) Chesapeake Bank had a right of endorsement and right to require endorsement; (h) to the best of Atomica's knowledge, each account debtor was

5

solvent; (i) each account debtor was liable for the amount set forth in the invoice and would not object to payment, or the quantity or quality of the subject matter; (j) each account debtor would promptly be notified that the invoice had been transferred and was payable to Chesapeake Bank; and (k) Atomica would not vary the terms of sale without Chesapeake Bank's consent.

20.       Pursuant to the Cash Flow Agreement, Atomica further represented, warranted, covenanted and agreed: (a) not to assign, transfer, sale or permit any lien or security interest in any invoice or collateral; (b) to notify Chesapeake Bank of any changes in name, organization, chief executive officer, or location of collateral or records and execute all documents necessary to perfect Chesapeake Bank's interest in the collateral; (c) pay all payroll and state and federal taxes and deliver evidence of payment if requested by Chesapeake Bank; and (d) any interest in copyrights, patents, trademarks and licenses would be disclosed to Chesapeake Bank.

21.       As collateral, to secure Atomica's obligations to Chesapeake Bank, Atomica granted Chesapeake Bank a security interest in all of its personal property, assets, and general intangibles.

## II.       Background and Formation of the Scheme to Defraud Chesapeake Bank

### A.       Corporate History and Governance of Atomica

22.       Upon information and belief, Atomica was founded in 1999 to offer, among other things, creative graphic design services including, but not limited to, design and illustration, photography, in-store marketing, brand package design, problem solving, advertising, and copy writing.

23.     Upon information and belief, the original principals of Atomica were Joseph DiPalma and Tiziano Recchia.  Upon further information and belief, Mr. DiPalma was responsible for sales, marketing, client relations, new business development and creative direction, while Mr. Recchia was responsible for art direction, management of the art department and operations.

24.     Upon information and belief, in or about October 2006, Atomica hired Defendant Stromberg as Chief Financial Officer.  Upon further information and belief, Stromberg was responsible for, among other things, keeping the company's books and records, preparation and production of daily, weekly, monthly and yearly financial statements, budgets, cash flow management and keeping the other principals advised of Atomica's financial position.  Stromberg remained in that capacity throughout the relevant time period.

25.     Stromberg was responsible for reviewing all Atomica invoices and having all invoicing information forwarded to Chesapeake Bank for purchasing by Chesapeake Bank.  Stromberg was Chesapeake Bank's direct business contact at Atomica.

26.     Upon information and belief, in or about March 2009, Stromberg introduced Cullen to Atomica.  Upon further information and belief, Cullen was named the Chief Development Officer. Cullen remained in that capacity throughout the relevant time period.

**B.    The Creation of So Real Brands As A Joint Venture of Atomica and Chance Productions**

27.     Upon information and belief, in the Spring of 2009, Atomica began to collaborate

7

with Chance Productions on the packaging design for certain Chance Productions' products. Upon further information and belief, David Divan, a former colleague of DiPalma, was the controlling member of Chance Productions.

28.     Upon information and belief, Atomica's perceived initial success of the collaboration between Atomica and Chance Productions resulted in the desire of Atomica and Chance Productions to enter into a joint venture. Upon further information and belief, DiPalma and Divan discussed the arrangements and DiPalma asked Cullen to have a Joint Venture Agreement drafted.

29.     Although disclosure of the joint venture is required by the Cash Flow Agreement, Chesapeake Bank was not made aware of the joint venture and did not agree to fund the joint venture through the Cash Flow Agreement or any other agreement.

30.     Upon information and belief, Atomica was to design and develop arts, crafts, stationery and activity products, as well as unique patented items and licensed properties. Upon further information and belief, Atomica also was to perform market research, competitive analysis, trend spotting, development of concepts, package design, production design, component design, illustrations, securing intellectual property protection, in-store marketing and other matters. Additionally, upon information and belief, the products to be developed were to be sold through Chance Productions' sales arm into retail chains such as Dollar General, Five Below, Walgreens, Toys R Us, Hobby Lobby, AC Moore, Michael's and mass market players such as Walmart, Big Lots and Target.

31.     Upon information and belief, Atomica and Chance Productions agreed that they

8

would split the majority of costs of any tooling, prototypes, samples and marketing, that Atomica would invest its time for design and product development and Chance Productions would handle the manufacturing and sales, and that the net profit would be split evenly between Atomica and Chance Productions.

32.     Additionally, upon information and belief, Atomica and Chance Productions agreed that the joint venture would be called "So Real Brands, LLC" and that Atomica and Chance Productions would each own fifty percent (50%) of So Real Brands. A purpose of the LLC was for trademark registration of the items developed by Atomica.

33.     Upon information and belief, in late June 2009, Cullen advised DiPalma that the So Real Brands name was available and advised that the LLC be formed under the law of the State of Delaware.

34.     Upon information and belief, So Real Brands, LLC was formed on June 29, 2009. Upon further information and belief, at the time So Real Brands was formed, Cullen represented to Atomica that Atomica and Chance Productions each owned fifty percent (50%) of So Real Brands.

35.     Upon information and belief, retail outlets expressed interest in Atomica's design of arts and crafts kits that would retail between five and ten dollars. Upon further information and belief, these kits were named so as to draw recognition to So Real Brands, *i.e.*, So Real Studios for beading kits, So Cool Crafts for craft items and So Cool Wood Products for craft kits designed for boys.

36.     Upon information and belief, Atomica also designed a line of scented markers named "Snozzberry."

9

37.     Upon information and belief, Atomica, at the request of Chance Productions, redesigned and redeveloped two art products called "Quickcolor" for which Chance Productions held patents. Atomica redesigned and rebranded the line under the name "Trizio" and "Hexos" and developed the products' packaging, rebranding and merchandising.

38.     Upon information and belief, patent applications were filed for the "Snozzberry," "Trizio," and "Hexos" products. Upon further information and belief, So Real Brands has applied for trademarks for "SNOZZBERRY," "TRIZIO," and "HEXOS" in Class 16 markers and pens.

39.     Upon information and belief, on or about August 1, 2009, Atomica hired Haley, a close friend of Divan, as a senior account manager. Haley worked on the So Real Brands project with Chance Productions. Haley had previously been employed as a buyer for AC Moore and Atomica believed his business connections would assist in the sale of the Atomica product line.

40.     Upon information and belief, in September 2009, the final joint venture agreement between Atomica and Chance Productions was executed.

         C.     **Formation of the Unlawful Scheme**

41.     With the creation of the joint venture underway, Stromberg, Cullen, Haley, Divan, Jud and Blemings and their wholly controlled entities Logistics, Chance Productions, and So Real Brands set out to exploit Atomica and defraud Chesapeake Bank.

42.     Defendants also used a shell entity, D2R, which, upon information and belief, does not exist as an entity separate and apart from Defendants in order to further exploit

Atomica and defraud Chesapeake Bank.

43.     Through course of dealing, Defendants were able to decipher Chesapeake Bank's auditing process of Atomica's accounts receivable, which included contacting the vendor contact, provided by Stromberg, for verification of the invoices.

44.     Defendants exploited Chesapeake Bank's auditing process by disguising Cullen, Haley, Divan, Jud and Blemings as the contacts for supposed legitimate customers of Atomica, when in fact they were working in concert to fraudulently extract money from Chesapeake Bank and usurp the corporate opportunities of Atomica.

45.     Stromberg knowingly and intentionally submitted fraudulent invoices for services allegedly performed by Atomica for Logistics, Chance Productions, So Real Brands and D2R and numerous other purported customers of Atomica to Chesapeake Bank for purchase.

46.     Cullen, representing himself as an accounts payable representative for Logistics, telephonically verified Atomica's fraudulent invoices to Logistics to representatives of Chesapeake Bank. At the time of verification, Chesapeake Bank did not know that Cullen was actually the Chief Development Officer of Atomica and a principal of So Real Brands, another entity Defendants were misrepresenting as a legitimate customer of Atomica.

47.     Cullen knowingly and intentionally misrepresented to Chesapeake Bank that the Logistics invoices were legitimate and failed to inform Chesapeake Bank that he was an employee of Atomica and a principal of So Real Brands.

48.     Divan and Jud electronically verified Atomica's invoices for Chance Productions

11

to Stromberg, knowing that Stromberg would forward them to Chesapeake Bank for the purpose of misrepresenting that Chance Productions was a customer of Atomica, when in fact Chance Productions was supposedly partnering with Atomica in So Real Brands.

49.      Divan knowingly and intentionally misrepresented to Chesapeake Bank that the Chance Productions invoices were legitimate and failed to inform Chesapeake Bank that he was a principal in Chance Productions which was allegedly partnering with Atomica in the creation of So Real Brands and not a customer paying for Atomica's services.

50.      Haley, another employee of Atomica, in turn, electronically forwarded So Real Brands financial statements to Chesapeake Bank and telephonically verified Atomica's invoices for So Real Brands to representatives of Chesapeake Bank. In doing so, Haley misrepresented that the invoices were for services performed by Atomica to So Real Brands. At the time of verification, Chesapeake Bank did not know that Haley was an employee of Atomica.

51.      Haley knowingly and intentionally misrepresented to Chesapeake Bank that the Atomica invoices for So Real Brands were legitimate and failed to inform Chesapeake Bank that he was an employee of Atomica.

52.      Blemings, yet another employee of Atomica, was provided by Stromberg to Chesapeake Bank by Stromberg as the contact person for D2R and, upon information and belief, worked in concert with Stromberg to further the Defendants'' scheme to defraud Chesapeake Bank. At that time, Chesapeake Bank did not know that Blemings was an employee of Atomica. In order to verify the D2R invoices, a representative of Chesapeake Bank contacted Blemings and received his voicemail. Chesapeake Bank

12

attempted again to verify the D2R invoices by calling Blemings. In response, Blemings answered his telephone and, in an effort to thwart detection by Chesapeake Bank of Defendant's fraudulent scheme, he immediately disconnected the line upon the realization that Chesapeake Bank was on the line.

      **D.**     **Chesapeake Bank Discovers Defendants' Scheme to Defraud the Bank**

53.      The financial relationship between Atomica and Chesapeake Bank was driven by the actions of Stromberg, Cullen, Haley, Divan, Jud and Blemings, acting through Atomica, Logistics, Chance Productions, So Real Brands and D2R.

54.      In November 2009, Chesapeake Bank, through its usual course of auditing, began to suspect that fraudulent receivables were being presented by Atomica for purchase by Chesapeake Bank.

      *1.*     *Logistics Associates of Wilmington, Ltd.*

55.      Specifically, Chesapeake Bank began to review the account activity of Logistics.

56.      In late May 2009, Stromberg submitted Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica performed work for and properly invoiced Logistics for approximately 72 invoices totaling $46,556.00. *See* Exhibit 2, attached hereto.

57.      During its audit, Chesapeake Bank, as was its practice, contacted Logistics by telephone to verify that certain of the invoices were authentic. On July 2, 2009, Cullen, identifying himself as "Jerry C" in the accounts payable department of Logistics, misrepresented to Chesapeake Bank that the Atomica invoices were for services actually performed by Atomica for Logistics. *See* Exhibit 2.

58.     In fact, unbeknownst to Chesapeake Bank, "Jerry C" was Cullen, the Chief Development Officer of Atomica.

59.     At no time had Atomica performed services on behalf of Logistics. Instead, Cullen made this misrepresentation intending to pay this first batch of invoices in order to induce Chesapeake Bank into believing that Logistics was a legitimate vendor so that future fraudulent invoices could be submitted to and purchased by Chesapeake Bank.

60.     On or about September 2, 2009, Cullen, acting with the specific intent to defraud, submitted his own personal check in the amount of $51,500.00 as payment for the Atomica invoices to Logistics. *See* Exhibit 3, attached hereto. The scheme well underway, Defendants set out to defraud Chesapeake Bank for even greater sums.

61.     In September 2009, Stromberg submitted another set of Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica performed work for and properly invoiced Logistics for approximately 15 invoices totaling $50,885. *See* Exhibit 4, attached hereto.

62.     Relying on the prior audit, the subsequent apparent payment by Logistics, and the misrepresentations of Stromberg, Cullen and Logistics, Chesapeake Bank purchased these invoices at the time they were presented for purchase by Atomica. These invoices were false and fraudulent in that Atomica performed no services for Logistics. Upon information and belief, Cullen and the other Defendants misappropriated the amounts Chesapeake Bank advanced for these invoices for their own gain. No payment on these invoices has ever been made to Chesapeake Bank.

63.     But for the fact that Chesapeake Bank thereafter discovered Defendants' illegal

14

scheme and ceased purchasing Logistics invoices, Defendants' submission of fraudulent invoices would have continued.

64.        Chesapeake Bank was defrauded out of $50,885.00 on the Logistics Account.

2.        *Chance Productions*

65.        Defendants' scheme was not just limited to Stromberg, Cullen and Logistics. The very same scheme was employed by Stromberg, Cullen, Chance Productions, Divan and Jud to obtain advances from Chesapeake Bank by presenting false invoices to Chesapeake Bank for purchase, and then misappropriating those proceeds to the detriment of Chesapeake Bank.

66.        In May and June of 2009, Stromberg submitted Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica performed work for and properly invoiced Chance Productions for approximately 90 invoices totaling $112,259.35. *See* Exhibit 5, attached hereto.

67.        Chesapeake Bank, as was its practice, contacted Chance Productions to verify that certain of the invoices were authentic. On August 10, 2009, Stromberg had forwarded to Chesapeake Bank an electronic message in which Chance Productions' agent, Divan, misrepresented that the Atomica invoices were for services actually performed by Atomica for Chance Productions. *See* Exhibit 6. Upon information and belief, Divan's representations were false in that Atomica did not bill Chance Productions for work actually performed by Atomica but, rather, the parties had agreed that Atomica would be paid a percentage share of the revenues of Chance Productions.

68.        Divan's representations were made to fraudulently induce Chesapeake to advance

15

even greater sums for Defendants to misappropriate for their own benefit.

69.     Upon information and belief, in keeping with this scheme, on or about September 16, 2009, Stromberg caused the sum of $100,000.00 to be paid to Atomica for this initial set of invoices by Edward D. McCreary, who, upon information and belief, is a close friend of Stromberg. *See* Exhibit 7, attached hereto.

70.     In an effort to conceal the fraud, Stromberg exclusively handled Atomica's fake invoices to Chance Productions, their submission to Chesapeake Bank for purchase, and Chance Productions' alleged payment of those invoices. *See* Exhibit 8, attached hereto.

71.     In September 2009, Stromberg submitted Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica had performed work and properly invoiced Chance Productions for approximately 30 invoices totaling $107,145.00. *See* Exhibit 9, attached hereto.

72.     Relying on the prior audit and subsequent apparent payment by Chance Productions, Chesapeake Bank purchased these invoices at the time they were presented for purchase by Atomica. These invoices were false and fraudulent in that any services performed by Atomica for Chance Productions were not actually billed by Atomica to Chance Productions, but, upon information and belief, instead were to be born by Atomica in exchange for future profits.

73.     In November 2009, Stromberg had submitted to Chesapeake Bank an electronic message from Jud misrepresenting to Chesapeake Bank that the Atomica invoices were for services actually performed by Atomica for Chance Productions and that payment by Chance Productions would be forthcoming. *See* Exhibit 10, attached hereto.

16

74.     Upon information and belief, Stromberg, Divan, Jud, Chance Productions and the other Defendants misappropriated the amounts Chesapeake Bank advanced for these invoices and others for their own gain.

75.     But for the fact that Chesapeake Bank thereafter discovered Defendants' illegal scheme and ceased purchasing Chance Productions invoices, Defendants' submission of fraudulent invoices would have continued.

76.     Chesapeake Bank was defrauded out of $107,145.00 on the Chance Productions account.

### 3.     So Real Brands

77.     Defendants perpetrated the same scheme to create a fictional customer/client relationship between So Real Brands and Atomica.

78.     In July and August 2009, Stromberg submitted Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica had performed work and properly invoiced So Real Brands for approximately 69 invoices totaling $100,013.98. Chesapeake Bank purchased these invoices at the time they were presented for purchase by Atomica. *See* Exhibit 11, attached hereto.

79.     During its audit, Chesapeake Bank, as was its practice, contacted So Real Brands to verify that certain of the invoices were authentic. Atomica, through Stromberg, had previously provided Chesapeake Bank with Haley's contact information as the agent for verification on the So Real Brands account. *See* Exhibit 12, attached hereto. On August 28, 2009, Haley, identifying himself as an agent of So Real Brands, misrepresented to Chesapeake Bank that the Atomica invoices were for services actually performed by

17

Atomica for So Real Brands. *See* Exhibit 11.

80.       In fact, unbeknownst to Chesapeake Bank, Haley was employed by Atomica. Also, unbeknownst to Chesapeake Bank, Cullen was involved in the creation of So Real Brands, in addition to verifying and warranting fraudulent invoices for Logistics and serving as Atomica's Chief Development Officer.

81.       Upon information and belief, Haley's representations were false in that Atomica was not billing So Real Brands for work performed but, rather, So Real Brands was the joint venture created by Atomica, through Cullen, and Chance Productions, through Divan.

82.       Haley's representations were made to induce Chesapeake Bank to advance even greater sums for Defendants to misappropriate for their own benefit.

83.       In keeping with this scheme, on or about October 29, 2009, So Real Brands issued a check, signed by Cullen, to Atomica in the amount of $50,000.00. *See* Exhibit 13, attached hereto. On October 30, 2009, the sum of $48,977.23 was paid to Chesapeake Bank as payment for this initial set of invoices.

84.       In October and November 2009, Stromberg submitted Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica had performed work and properly invoiced So Real Brands for approximately 38 invoices totaling $73,726.03. *See* Exhibit 14, attached hereto.

85.       On November 1, 2009, So Real Brands issued a check, signed by Cullen, to Atomica in the amount of $10,160.00. *See* Exhibit 15, attached hereto.

86.       Relying on financial reports tendered by So Real Brands, the prior audit and

18

subsequent apparent partial payment by So Real Brands, Chesapeake Bank purchased these invoices at the time they were presented for purchase by Atomica. These invoices were false and fraudulent in that any services performed by Atomica for So Real Brands were not to be billed by Atomica, but were to accord with Atomica's and Chance Productions' joint venture agreement.

87.     Upon information and belief, Stromberg, Haley, Cullen, So Real Brands, Divan, Chance Productions and the other Defendants misappropriated the amounts Chesapeake Bank advanced for the So Real Brands invoices for their own gain.

88.     But for the fact that Chesapeake Bank thereafter discovered Defendants' illegal scheme and ceased purchasing So Real Brands invoices, Defendants' submission of fraudulent invoices would have continued.

89.     Chesapeake Bank was defrauded out of $114,566.75 on the So Real Brands Account.

                    4.     D2R

90.     Defendants again utilized the same scheme to create a fictional customer/client relationship between D2R and Atomica for the purposes of defrauding Chesapeake Bank.

91.     In September 2009, Stromberg submitted Atomica invoices to Chesapeake Bank for purchase that falsely represented and warranted that Atomica had performed work and properly invoiced D2R for approximately 22 invoices totaling $50,674.00. Chesapeake Bank purchased these invoices at the time they were presented for purchase by Atomica. *See* Exhibit 16, attached hereto.

92.     Atomica, through Stromberg, provided Chesapeake Bank with Blemings' contact

information as the agent for verification on the D2R account. In order to verify the D2R invoices, a representative of Chesapeake Bank contacted Blemings and received his voicemail. Chesapeake Bank again attempted to verify the D2R invoices by calling Blemings. In response, Blemings answered his telephone and, in an effort to avoid discovery by Chesapeake Bank of Defendants' unlawful scheme, immediately disconnected the line upon the realization that Chesapeake Bank had initiated the call. Neither D2R nor any other person has paid these invoices.

93.     In fact, unbeknownst to Chesapeake Bank, Blemings was employed by Atomica.

94.     Upon information and belief, D2R did not and does not exist as an entity separate and distinct from Defendants.

95.     Upon information and belief, Stromberg, Blemings and the other Defendants misappropriated the amounts Chesapeake Bank advanced for the D2R invoices for their own gain.

96.     But for the fact that Chesapeake Bank thereafter discovered Defendants' illegal scheme and ceased purchasing D2R invoices, Defendants' submission of fraudulent invoices would have continued.

97.     Chesapeake Bank was defrauded out of $50,674.00 on the D2R Account.

        5.     *Inkwell International*

98.     Defendants once again exercised the fraudulent scheme to create a fictional customer/client relationship between Inkwell International and Atomica for the purposes of defrauding Chesapeake Bank.

99.     In September 2009, Stromberg submitted Atomica invoices to Chesapeake Bank

that falsely represented and warranted that Atomica had performed work and properly invoiced Inkwell International for approximately 12 invoices totaling $51,350.00. Chesapeake Bank purchased these invoices at the time they were presented for purchase by Atomica. *See* Exhibit 17, attached hereto.

100.    Atomica, through Stromberg, provided Chesapeake Bank with Nick Sabatino's contact information as the agent for verification on the Inkwell International account. On November 3, 2009, Nick Sabatino misrepresented to Chesapeake Bank that the Atomica invoices were for services actually performed by Atomica for Inkwell International. *See* Exhibit 18.

101.    In fact, unbeknownst to Chesapeake Bank and upon information and belief, Sabatino is the brother-in-law of Blemings, Atomica's payroll manager and the supposed verification agent for D2R. Also, unbeknownst to Chesapeake Bank, and upon information and belief, Stromberg and Cullen are investors in Inkwell International.

102.    Upon information and belief, Stromberg and Sabatino's representations were false in that Atomica was not billing Inkwell International for work performed.

103.    Stromberg and Sabatino's representations were made to induce Chesapeake Bank to advance even greater sums for Defendants to misappropriate for their own benefit.

104.    But for the fact that Chesapeake Bank thereafter discovered Defendants' illegal scheme and ceased purchasing Inkwell International invoices, Defendants' submission of fraudulent invoices would have continued.

105.    Chesapeake Bank was defrauded out of $51,350.00 on the Inkwell International Account

21

6.     *A1 Carpet Cleaners*

106.     In September and November 2009, Stromberg submitted Atomica invoices to

Chesapeake Bank that falsely represented and warranted that Atomica had performed

work and properly invoiced A1 Carpet Cleaners for approximately 17 invoices totaling

$51,000.25. Chesapeake Bank purchased these invoices at the time they were presented

for purchase by Atomica. *See* Exhibit 19, attached hereto.

107.     Upon Chesapeake Bank's subsequent inquiry to A1 Carpet Cleaners, Chesapeake

Bank discovered that A1 Carpet Cleaners was not a customer of Atomica, but instead

provided cleaning services for Atomica's offices.

108.     Upon information and belief, Defendants misappropriated the amounts

Chesapeake Bank advanced for these A1 Carpet Cleaning invoices for their own gain.

109.     But for the fact that Chesapeake Bank thereafter discovered Defendants' illegal

scheme and ceased purchasing A1 Carpet Cleaning invoices,  Defendants' submission of

fraudulent invoices would have continued.

110.     Chesapeake Bank was defrauded out of $51,000.25 on the A1 Carpet Cleaning

Account.

7.     *Other Invoices*

111.     Defendants did not restrict their scheme to Logistics, Chance Productions, So

Real Products, D2R, Inkwell and A1 Carpet Cleaners. Defendants' fraudulent conduct

extended to Defendants presenting Atomica's invoices for purchase by Chesapeake Bank

with respect to accounts receivable of legitimate customers for whom Atomica previously

had performed services and Chesapeake Bank previously had purchased invoices and

22

duly received payments.

112.　　For example, in June 2009 through October 2009, Stromberg submitted approximately 8 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Bon Vivant, Int'l, in the amount of $8,565.00. *See* Exhibit 20, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Bon Vivant, only $1,375.00 of the $8,565.00 could be verified by Bon Vivant. Bon Vivant disputed the validity of the invoices.

113.　　Consequently, Chesapeake Bank was defrauded out of $7,190.00 by Defendants on the Bon Vivant account.

114.　　 In August and September 2009, Stromberg submitted approximately 2 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to American Trading Company, in the amount of $1,300.00. *See* Exhibit 21, attached hereto. Upon Chesapeake Bank's subsequent inquiry to American Trading Company, neither invoice could be verified by American Trading Company. American Trading Company disputed the validity of the invoices.

115.　　Consequently, Chesapeake Bank was defrauded out of $1,300.00 by Defendants on the American Trading Company account.

116.　　In August and November 2009, Stromberg submitted approximately 5 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Campbell Soup Co, in the amount of $26,950.00. *See* Exhibit 22, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Campbell Soup, not one of the five invoices could be verified by Campbell Soup. Campbell Soup disputed the validity of the

23

invoices.

117.     Consequently, Chesapeake Bank was defrauded out of $26,950.00 by Defendants on the Campbell Soup account.

118.     In July through September 2009, Stromberg submitted approximately 7 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Crayola, in the amount of $18,975.00. *See* Exhibit 23, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Crayola, only $1,000.00 of the $18,975.00 could be verified by Crayola. Crayola disputed the validity of the invoices.

119.     Consequently, Chesapeake Bank was defrauded out of $17,975.00 by Defendants on the Crayola account.

120.     In September and November 2009, Stromberg submitted approximately 2 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Design Circle, Inc., in the amount of $3,000.00. *See* Exhibit 24, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Design Circle, neither invoice could be verified by Design Circle. Design Circle disputed the validity of the invoices.

121.     Consequently, Chesapeake Bank was defrauded out of $3,000.00 by Defendants on the Design Circle account.

122.     In July 2009, Stromberg submitted approximately 2 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Disney Consumer Products, in the amount of $6,700.00. *See* Exhibit 25, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Disney Consumer Products, neither invoice could be verified by Disney. Disney disputed the validity of the invoices.

24

123.    Consequently, Chesapeake Bank was defrauded out of $6,700.00 by Defendants on the Disney account.

124.    In September 2009, Stromberg submitted approximately 2 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Douglas Walsh, in the amount of $2,535.00. *See* Exhibit 26, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Walsh, neither invoice could be verified by Walsh. Walsh disputed the validity of the invoices.

125.    Consequently, Chesapeake Bank was defrauded out of $2,535.00 by Defendants on the Walsh account.

126.    In July and August 2009, Stromberg submitted approximately 10 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Fisher Price, Inc. in the amount of $20,154.00. *See* Exhibit 27, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Fisher Price not one of the invoices could be verified by Fisher Price. Fisher Price disputed the validity of the invoices.

127.    Consequently, Chesapeake Bank was defrauded out of $20,154.00 by Defendants on the Fisher Price account.

128.    In September 2009, Stromberg submitted an Atomica invoice to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Fresh Books in the amount of $300.00. *See* Exhibit 28, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Fresh Books, the invoice could not be verified by Fresh Books. Fresh Books disputed the validity of the invoice.

129.    Consequently, Chesapeake Bank was defrauded out of $300.00 by Defendants on

the Fresh Books account.

130.     In July 2009, Stromberg submitted approximately 4 Atomica invoices to

Chesapeake Bank for purchase for services allegedly rendered by Atomica to Gamma

Millennium Technologies, LLC in the amount of $14,800.00. *See* Exhibit 29, attached

hereto. Upon Chesapeake Bank's subsequent inquiry to Gamma Millennium

Technologies, not one of the invoices could be verified by Gamma Millennium

Technologies. Gamma Millennium Technologies disputed the validity of the invoices.

131.     Consequently, Chesapeake Bank was defrauded out of $14,800.00 by Defendants

on the Gamma Millennium Technologies account.

132.     In July 2009, Stromberg submitted an Atomica invoice to Chesapeake Bank for

purchase for services allegedly rendered by Atomica to Heat Genie in the amount of

$3,000.00. *See* Exhibit 30, attached hereto. Upon Chesapeake Bank's subsequent inquiry

to Heat Genie, the invoice could not be verified by Heat Genie. Heat Genie disputed the

validity of the invoice.

133.     Consequently, Chesapeake Bank was defrauded out of $3,000.00 by Defendants

on the Heat Genie account.

134.     In November 2009, Stromberg submitted an Atomica invoice to Chesapeake Bank

for purchase for services allegedly rendered by Atomica to IMG World Licensing in the

amount of $3,500.00. *See* Exhibit 31, attached hereto. Upon Chesapeake Bank's

subsequent inquiry to IMG World Licensing, the invoice could not be verified by IMG

World Licensing. IMG World Licensing disputed the validity of the invoice.

135.     Consequently, Chesapeake Bank was defrauded out of $3,500.00 by Defendants

on the IMG World Licensing account.

136. In October 2009, Stromberg submitted approximately 17 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to IYA Technology Laboratories in the amount of $58,500.00. *See* Exhibit 32, attached hereto. Upon Chesapeake Bank's subsequent inquiry to IYA Technology Laboratories, the invoices could not be verified by IYA Technology Laboratories. IYA Technology disputed the validity of the invoices.

137. Consequently, Chesapeake Bank was defrauded out of $58,500.00 by Defendants on the IYA Technology Laboratories account.

138. In June through October 2009, Stromberg submitted approximately 120 Atomica invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to LaRose Industries in the amount of $132,979.27. *See* Exhibit 33, attached hereto. Upon Chesapeake Bank's subsequent inquiry to LaRose Industries, the invoices could not be verified by LaRose Industries. LaRose Industries disputed the validity of the invoices.

139. Consequently, Chesapeake Bank was defrauded out of $132,979.27 by Defendants on the LaRose Industries account.

140. In August 2009, Stromberg submitted 2 Atomica invoice to Chesapeake Bank for purchase for services allegedly rendered by Atomica to Marvel Entertainment in the amount of $7,050.00. *See* Exhibit 34, attached hereto. Upon Chesapeake Bank's subsequent inquiry to Marvel Entertainment, neither invoice could be verified by Marvel Entertainment. Marvel Entertainment disputed the validity of the invoices.

141. Consequently, Chesapeake Bank was defrauded out of $7,050.00 by Defendants

27

on the Marvel Entertainment account.

142.    In October 2009, Stromberg submitted approximately 5 Atomica invoices to
Chesapeake Bank for purchase for services allegedly rendered by Atomica to Mesa Fresh
Mexican Grill in the amount of $15,275.00. *See* Exhibit 35, attached hereto. Upon
Chesapeake Bank's subsequent inquiry to Mesa Fresh Mexican Grill, the invoices could
not be verified by Mesa Fresh Mexican Grill. Mesa Fresh Mexican Grill disputed the
validity of the invoices.

143.    Consequently, Chesapeake Bank was defrauded out of $15,275.00 by Defendants
on the Mesa Fresh Mexican Grill account.

144.    In August 2009, Stromberg submitted an Atomica invoice to Chesapeake Bank for
purchase for services allegedly rendered by Atomica to SRM Entertainment in the amount
of $2,600.00. *See* Exhibit 36, attached hereto. Upon Chesapeake Bank's subsequent
inquiry to SRM Entertainment, the invoice could not be verified by SRM Entertainment.
SRM Entertainment disputed the validity of the invoice.

145.    Consequently, Chesapeake Bank was defrauded out of $2,600.00 by Defendants
on the SRM Entertainment account.

146.    In July and August 2009, Stromberg submitted approximately 11 Atomica
invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to
Walmart in the amount of $66,725.00. *See* Exhibit 37, attached hereto. Upon
Chesapeake Bank's subsequent inquiry to Walmart, the invoices could not be verified by
Walmart. Walmart disputed the validity of the invoices.

147.    Consequently, Chesapeake Bank was defrauded out of $66,725.00 by Defendants

on the Walmart account.

148.     In August and September 2009, Stromberg submitted approximately 5 Atomica

invoices to Chesapeake Bank for purchase for services allegedly rendered by Atomica to

Ashers Chocolates in the amount of $17,800.00. *See* Exhibit 38, attached hereto. Upon

Chesapeake Bank's subsequent inquiry to Ashers Chocolate the invoices could not be

verified by Ashers Chocolate. Ashers Chocolate disputed the validity of the invoices.

149.     Consequently, Chesapeake Bank was defrauded out of $17,800.00 by Defendants

on the Ashers Chocolate account.

150.     In November 2009, Chesapeake Bank informed Atomica that Atomica was

indebted to Chesapeake Bank in excess of $800,000.00 and that Chesapeake Bank

believed that fraudulent invoices had been submitted to Chesapeake Bank in order that

Atomica could receive cash advances from Chesapeake Bank pursuant to the Cash Flow

Agreement.

151.     Moreover, upon information and belief, in November 2009, Atomica ceased to be

a going concern, and any funds that would have otherwise been available to repay the

Chesapeake Bank has been diverted by Defendants for their own gain.

### E.     Defendants Usurping of Chesapeake Bank's Interest In Atomica's Intellectual Property

152.     Atomica granted Chesapeake Bank a security interest in all of its personal

property, assets, and general intangibles to secure Atomica's indebtedness under the Cash

Flow Agreement. *See* Exhibit 39, attached hereto.

153.     As part of their illegal scheme to enrich themselves at Chesapeake Bank's

expense, Defendants conspired to take confidential and propriety information including, but not limited to, product designs, product technology, product development strategies, sales strategies, business strategies, methodologies, technical capabilities and formulas, which was the property of Atomica, for the benefit of themselves, So Real Brands, Chance Productions and to the prejudice of Atomica and Chesapeake Bank.

154.     Cullen has seized control over So Real Brands, not as a joint venture owned 50% by Atomica but as an entity solely owned by Cullen to the exclusion of Atomica.

155.     Cullen and So Real Brands have retained former Atomica employees to develop the products that Atomica designed.

156.     Upon information and belief, using funds fraudulently obtained from Chesapeake Bank, Defendants continue to collaborate and offer for sale products designed by Atomica and continue to develop additional Atomica product ideas.

157.     Defendants have misappropriated Atomica's revenues by unlawfully converting Atomica's intellectual property to the prejudice of Atomica and Chesapeake Bank.

### COUNT I
### Violation of 18 U.S.C. § 1962(c)

158.     Chesapeake Bank realleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

159.     Defendants are "persons" under 18 U.S.C. §§ 1961(3) and 1964(c).

160.     Atomica constitutes an "enterprise" under 18 U.S.C. §§ 1961(4) and 1962(c).

161.     Atomica was engaged in and its activities affected interstate commerce.

162.     Each of the individual Defendants, along with Defendants Logistics, Chance

Productions and So Real Brands, were and are associated with Atomica and have conducted or participated, directly or indirectly, in the management and/or operation of the affairs of Atomica in its relationship to Chesapeake Bank through a pattern of unlawful activity under 18 U.S.C. §§ 1961(B).

163. The Defendants violated 18 U.S.C. §§ 1343 (wire fraud) and 1344 (bank fraud) in that they knowingly participated in a scheme to defraud Chesapeake Bank, and the interstate wire facilities were used in furtherance of the scheme.

164. Defendants' conduct in furtherance of their scheme to defraud Chesapeake Bank has the same or similar purposes, victims, and method of commission, and is otherwise interrelated by distinguishing characteristics and non-isolated events.

165. The scope and persistence of Defendants' conduct poses a special threat to social well-being, especially as it relates to Defendants' continued use in interstate commerce of monies fraudulently obtained from a state-charted and federally insured banking institution.

166. Chesapeake Bank has suffered substantial injury to its business and property within the meaning of 18 U.S.C. 1964(c) by reason of Defendants' conduct and violations of 18 U.S.C. §§ 1343 and 1344.

167. Chesapeake Bank continues to suffer substantial injury to its business and property within the meaning of 18 U.S.C. 1964(c) by reason of Defendants' violations of 18 U.S.C. §§ 1343 and 1344, as Defendants continue to sell and develop Atomica's products and convert assets from the sale of those products at the exclusion of Atomica and Chesapeake Bank.

## COUNT II
### Common Law Conspiracy

168.     Chesapeake Bank realleges and incorporates by reference the allegations

contained in the preceding paragraphs as if fully set forth herein.

169.     Defendants' conduct alleged herein constitutes concerted action and a

combination by two or more persons to obtain money from Chesapeake Bank by unlawful

means.

170.     As a direct and proximate result of Defendants' actions, Chesapeake Bank has

suffered damages.

## COUNT III
### Fraud

171.     Chesapeake Bank realleges and incorporates by reference the allegations

contained in the preceding paragraphs as if fully set forth herein.

172.     Defendants knowing submitted and verified false invoices to Chesapeake Bank in

exchange for payments from Chesapeake Bank pursuant to the Cash Flow Agreement.

Upon information and belief, Atomica did not receive the full proceeds of these false

invoices.  Rather, Defendants misappropriated some, if not all, of the proceeds from these

fraudulent transactions.

173.     The misrepresentations of Defendants were materially false, misleading and

contained material omissions.

174.     Defendants intended the initial payments provided by Logistics, Chance

Productions and So Real Brands to instill a false sense of legitimacy in representatives of

Chesapeake Bank, so that Chesapeake Bank would purchase additional receivables for

32

services allegedly performed for these fictional shell entities.

175.     Defendants also developed a scheme to fraudulently add additional invoices to

otherwise legitimate customer accounts in an effort to preclude auditing by Chesapeake

Bank of those accounts.

176.     Chesapeake Bank reasonably relied upon the misrepresentations and material

omissions of Defendants in purchasing Atomica's invoices as presented by Defendants.

177.     As a direct and proximate result of Defendants' actions, Chesapeake Bank has

suffered damages.

## COUNT IV
### Conversion

178.     Chesapeake Bank realleges and incorporates by reference the allegations

contained in the preceding paragraphs as if fully set forth herein.

179.     Defendants' conduct alleged herein constitutes distinct acts of dominion or control

wrongfully exerted over the property of Chesapeake Bank inconsistent with and in denial

of Chesapeake Bank's rights.

180.     As a direct and proximate result of Defendants' actions, Chesapeake Bank has

suffered damages.

## COUNT V
### Unjust Enrichment/Money Had and Received

181.     Chesapeake Bank realleges and incorporates by reference the allegations

contained in the preceding paragraphs as if fully set forth herein.

182.     Chesapeake Bank had a preexisting right to the money wrongfully obtained by

Defendants, which money the Defendants justly should not retain.

33

183.     As a direct and proximate result of Defendants' actions, Chesapeake Bank has

suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment in its favor and against Defendants, jointly

and severally:

a)     For compensatory damages in an amount to be proven at trial, but no less than

$800,000.00, resulting from Defendants' acts and omissions;

b)     For treble the damage sustained by Plaintiff as a result of the acts and omissions

of Defendants, and for Plaintiff's costs, reasonable attorney's fees and pre-

judgment as well as post-judgment interest;

c)     For punitive damages to punish Defendants for their willful and malicious

conduct;

d)     For a preliminary and permanent injunction preventing Defendants from the

continued unlawful use of Atomica's intellectual property to the prejudice of

Chesapeake Bank's interest therein;

e)     For imposition of a constructive trust in favor of Chesapeake Bank and the

placement of all corporate assets of So Real Brands, Logistics and Chance

Productions into said constructive trust;

f)     For an accounting to Plaintiff of all profits, gains and advantages derived by

Defendants from their fraud and fraudulent misrepresentations, and other unlawful

acts complained of herein; and

34

g)     For all such other relief as this Court deems appropriate.

Plaintiff hereby demands trial by jury on all issues so triable.

April 16, 2010

Respectfully Submitted,

**CHESAPEAKE BANK**

BY: _____

Paul Wilbur Jacobs, II (VSB 16815)
Rowland Braxton Hill, IV (VSB 41539)
Belinda D. Jones (VSB 72169)
CHRISTIAN & BARTON LLP
909 East Main Street, Suite 1200
Richmond, Virginia 23219
Telephone: (804) 697-4100
Facsimile (804) 697-4112

Attorneys for Plaintiff

1035765.7

35